UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                         Criminal No. 22-cr-090-SE
                                              Opinion No. 2023 DNH 119

Garrito Fort

O R D E R

The government charged Garrito Fort with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) & 924(e). Fort filed a "Notice of Defense – Duress" (doc. no. 31), in which he informed the court and the government that he intended to rely on the justification defenses of duress, necessity and self-defense at trial. The government then filed a motion in limine, seeking to preclude Fort from introducing evidence of or argument in support of a justification defense at trial. Doc. no. 39. After Fort's objection and a hearing, and for the reasons stated below, the court grants the government's motion.

Background[1]

In November 2021, Fort was living with his girlfriend, Amanda Lovejoy, in Seabrook, New Hampshire. They lived in a

---

[1] The facts in this section are taken from the evidence the parties offered in relation to the government's motion in limine. They are viewed in the light most favorable to Fort. See, e.g., United States v. Gomez, 92 F.3d 770, 775 (9th Cir.

house owned by Lovejoy's grandfather, Richard Janvrin Sr.[2] A video camera attached to the house recorded the front of the yard where Fort parked his cars.

In the early morning hours of November 1, 2021, the camera streamed video to Fort's and Lovejoy's cell phones of Chris Coletti intentionally "scuff[ing] the . . . mirror" of one of Fort's cars with his own. Ex. 4T at 1301. Fort intended to talk to Coletti about the incident the next morning and get him to pay for the damage.

Fort proffered evidence at the hearing that he was familiar with Coletti's reputation. According to Fort's offer of proof, he knew that Coletti was a drug user and had been paid for work in drugs rather than money. Fort also knew that Coletti had previously assaulted another person and had committed a robbery. In addition, Coletti, who is white, had previously called Fort a racial slur.

---

1996) (noting that when considering whether a defendant has proffered adequate evidence to present a justification defense to the jury, the court must view the evidence in the light most favorable to the defendant). They are not in dispute unless otherwise noted.

[2] The government disputes that Fort lived at the house in question, and Janvrin Sr. testified at the hearing that Fort did not live there, but rather stayed over once or twice a week. Because whether Fort resided at the house or not is inconsequential to the court's decision, the court assumes for the purpose of this order that Fort lived at Janvrin Sr.'s house.

On the morning of November 1, 2021, Fort saw Coletti outside Janvrin Sr.'s house. Coletti was at his truck with Janvrin Sr. Janvrin Sr. testified at the hearing that Coletti had been there for about 15-20 minutes before Fort came out of the house. Fort told police that when he saw Coletti, he went "rushing to get outside . . . to get to him before he leaves, so [Fort] could talk to him, because [he knew Coletti was] going to work." Id. at 1265.

Fort, a former felon, stipulated at the hearing that he left the house knowing that he had a gun in the pocket of his hooded sweatshirt.[3] He did not intend to use the gun but, as he told police afterward, he kept it as "a form of intimidation," id. at 1264, and for "scare tactics," id. at 1084. Indeed, Fort told police that in response to Lovejoy's admonition at the time not to use the gun, he had told her: "I'm not going to have to. You know, I'm not going to have to, because I was just like joking." Id. at 1257.

Fort walked over to Coletti and Janvrin Sr. to talk to Coletti about the damage to Fort's car and to ask him to pay for

---

[3] The government introduced evidence showing that Fort knew he had a gun in his pocket before he approached Coletti. Because Fort stipulated for the purpose of the government's motion that he knowingly possessed the gun when he left the house, the government did not spend significant time on this evidence at the hearing.

3

it.[4] The discussion became heated and both men began yelling. Lovejoy walked out of the house and over to the area where Coletti and Fort were arguing. Although unclear from the audio, Fort told the police that Coletti used racial slurs during the argument.

Eventually, Janvrin Sr. and Lovejoy helped to separate Fort and Coletti. At around this time, Coletti grabbed an object out of his truck to use as a weapon and started swinging it.[5] In response to Coletti's actions, Fort removed the gun from his pocket and brandished it. Now back on camera, Janvrin Sr. continued to help separate Fort from Coletti and told Fort to put the gun away, but Fort did not. Lovejoy removed the weapon from Coletti's hand and threw it on the ground.

After being separated, Fort again approached Coletti as the two men continued arguing, and they returned to the area outside of camera range. Fort's counsel represented at the hearing that Fort approached Coletti at this time because Coletti was wrestling with Lovejoy.

---

[4] The video footage of the November 1, 2021 incident does not show the area where Coletti and Janvrin Sr. were working or where this initial interaction took place. It does include muddled audio, however.

[5] The object Coletti is holding in the video is unclear, but Janvrin Sr. told police that it was "a pole with an ice scraper on one end."

Shortly thereafter, the two men reappeared on-screen. Coletti approached Fort with his fists raised and Fort backed away for several seconds. As Fort backed up, Richard Janvrin Jr., Janvrin Sr.'s son and Lovejoy's uncle, emerged from the house and hit Fort in the face without warning. Fort then immediately shot Janvrin Jr. and Coletti in short succession. Janvrin Jr. survived, but Coletti died at the scene.

## Discussion

The government moves in limine to preclude Fort from offering a justification defense at trial. The court held an evidentiary hearing on August 24, 2023, during which Janvrin Sr. testified and both parties offered evidence in support of their respective positions.

The First Circuit recognizes a justification defense to a felon-in-possession charge. United States v. Leahy, 473 F.3d 401, 409 (1st Cir. 2007). At trial, a defendant must satisfy four elements by a preponderance of the evidence:

> (i) [the defendant] was under an unlawful and present threat of death or serious bodily injury;
>
> (ii) he did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct;
>
> (iii) he had no reasonable legal alternative but to engage in that conduct; and

5

> (iv) there was a direct causal relationship between his criminal conduct and the need to avoid the threatened harm.

Id. at 404.

At this stage the bar is much lower than proof by a preponderance of the evidence. The "Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Brown v. Ruane, 630 F.3d 62, 71 (1st Cir. 2011) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quotation omitted)). The "right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Guzman, 603 F.3d 99, 109 (1st Cir. 2010) (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998) (quotation omitted)). For instance, "when the proffer in support of an anticipated affirmative defense is insufficient as a matter of law to create a triable issue, a district court may preclude the presentation of that defense entirely." United States v. Maxwell, 254 F.3d 21, 26 (1st Cir. 2001) (citing United States v. Bailey, 444 U.S. 394, 414–15 (1980)).

To be entitled to present an affirmative defense at trial, the defendant must "carry [an] entry-level burden of adducing competent proof" of the defense. Maxwell, 254 F.3d at 26; see also United States v. Brodhead, 714 F. Supp. 593, 596 (D. Mass. 1989) ("The constitutional right of the defendant to a fair trial is not diminished if the defendant is precluded from

6

raising defenses for which she can present no supporting evidence at all."). This burden requires the defendant to "present 'more than a scintilla of evidence' that demonstrates that he can satisfy the legal requirements for asserting the proposed defense." United States v. Winnett, No. CRIM.A. 02-10272-RBC, 2003 WL 21488645, at *4 (D. Mass. June 23, 2003) (quoting United States v. Tokash, 282 F.3d 962, 967 (7th Cir. 2002)). "The in limine procedure is proper to determine whether defendant's anticipated defense is sufficient, as a matter of law, to present to the jury." United States v. Gottesfeld, 313 F. Supp. 3d 360, 362 (D. Mass. 2018).

The government argues that Fort cannot meet his minimal burden as to any of the four elements of a justification defense and, therefore, should not be allowed to present the defense at trial. After considering the evidence and the parties' arguments, the court agrees with the government. Fort has not satisfied his burden as to any of the four elements of the justification defense, let alone all of them. Thus, he is not permitted to present evidence or argument in favor of the justification defense at trial.

I.  Unlawful and Present Threat

To meet the first element, a defendant must "offer sufficient evidence to establish that [he] was under an

7

'unlawful and imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury' at the time he was found in possession of a firearm." United States v. Henderson, 911 F.3d 32, 36 (1st Cir. 2018) (quoting Dixon v. United States, 548 U.S. 1, 4 n.2 (2006) (quotation omitted)). "'[I]mminence' requires a real emergency giving rise to immediate danger to oneself or to a third party." Henderson, 911 F.3d at 36.

Fort stipulated for the purpose of the government's motion that he knew he had the gun in his pocket when he left his house to confront Coletti. Thus, the question is whether Fort has proffered any competent evidence to show that, at the time he left the house, he was under an imminent threat of death or serious bodily injury. He has not.

Fort's statements to the police make it clear that he went to talk to Coletti to ask him to pay for the damage to his car. He further stated that he brought the gun with him to "intimidate" or "scare" Coletti, not because he felt he was in imminent danger. Fort offered no evidence to the contrary at the hearing. Instead, he argued that "he kept the gun hidden and brought it out when he needed to, when he was facing an attack." Hearing Tr. 112:7-8. Inherent in this assertion is an acknowledgement that he was not under an imminent threat when he left the house.

8

Nevertheless, at the hearing, Fort's counsel made various arguments that there was evidence of an unlawful and present threat of death or serious bodily injury. He pointed to the fact that Coletti had intentionally damaged Fort's car the night before and that the video showed Coletti as the aggressor, holding his fists up while walking toward Fort despite knowing that Fort had a gun. He further argued that, before leaving the house, Fort could not know how Coletti would react to Fort asking him to pay for the damage, given Coletti's history of violence, drug addiction, and racism. Id. 130:23-131:5. And so, Fort argues, he was entitled to a "preemptive concealed arming." Id. 143:14-22. Those arguments misunderstand the first element of the justification defense to a felon-in-possession charge.

To be able to present the justification defense to the jury, Fort must adduce some evidence — indeed, any evidence — that he was under an unlawful and present threat of death or serious bodily injury at the moment he first possessed the gun. See, e.g., United States v. Perrin, 45 F.3d 869, 874 (4th Cir. 1995) (holding that for a defendant to meet the first prong of a justification defense to a felon-in-possession charge, he "must show that a real and specific threat existed at the time of the unlawful possession" (quotation omitted)). The question before this court is not whether there is evidence from which a reasonable jury could conclude that Fort was justified in

9

brandishing the weapon or shooting Coletti or Janvrin Jr. See United States v. Salgado-Ocampo, 159 F.3d 322, 326 (7th Cir. 1998), as amended (Nov. 4, 1998) (noting when discussing the justification defense that it "is important to note that the defendant is charged with illegal possession of a firearm, not illegal use of a firearm. The relevant inquiry is thus whether he was justified at the moment he borrowed the .380 pistol from his neighbor, not when he brandished the weapon at his wife's neighbor's boyfriend."). Nor is the question whether there was a possibility that Coletti could react poorly, even violently, when Fort confronted him about the damage to Fort's car. Id. (holding that the defendant failed to show present threat of bodily harm justifying possession of a firearm despite phone call from assailants stating that they would come over and kill him because "it was not at all clear the threat would ever be carried out, much less imminently"). Rather, the question is whether there is any competent proof that Fort was under an imminent threat of death or serious bodily injury at the time he left his house knowing he had a gun.

There is none. Even if Coletti's actions ultimately constituted an immediate danger, Fort was already in possession of the firearm. The threat of injury from Coletti's fists or his makeshift weapon cannot have prompted Fort to possess the firearm before that threat manifested itself. Fort's statements

10

to police, the video recording of the encounter, and the evidence Fort offered at the hearing all show that there is no competent proof of an imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury at the moment Fort left the house with the gun. Therefore, Fort cannot satisfy the first prong of the four-part test.

Fort's failure to proffer sufficient evidence with respect to the first prong precludes him from offering the justification defense at trial. Nevertheless, because Fort failed to proffer sufficient evidence with respect to any of the four prongs of the defense, the court discusses the remaining elements below.

II.   Recklessness

Even if Fort had met his burden to show that he faced an unlawful and present threat of harm, Fort has not adduced any competent proof to meet the second prong of the justification defense. There is no dispute that Fort voluntarily left his house to initiate a discussion with Coletti, while Coletti had been outside ignoring Fort and assisting Janvrin Sr. for some time. Thus, the record only supports the conclusion that Fort recklessly placed himself in the situation that purportedly forced him to break the law by possessing a firearm.

11

The Eighth Circuit's decision in United States v. Blankenship, 67 F.3d 673 (8th Cir. 1995) is instructive. There, Blankenship was charged with being a felon in possession of a firearm. Blankenship had been in his trailer home in the late evening when a man named Kellick, with others, arrived seeking the return of money Kellick claimed Blankenship owed him. Kellick threatened to harm both Blankenship and his family if he did not pay. Blankenship went out to talk to Kellick, who had a reputation for violence and was known to carry a knife or razor. The confrontation escalated. Blankenship went back inside his trailer, slipped out the back door, went to a nearby trailer, retrieved a shotgun, and returned to the yard to protect his family. Kellick refused to leave and grabbed for the shotgun, the two men scuffled, and the shotgun inadvertently discharged, killing Kellick.

The district court granted the government's motion to exclude testimony that Blankenship intended to offer at trial to prove a justification defense. On appeal, the Eighth Circuit affirmed, agreeing with the district court's conclusion that the proffered facts were not sufficient to allow evidence of the justification defense. With regard to the second element of the defense, the Eighth Circuit stated:

> Blankenship recklessly placed himself in the situation. He did not have to open the door or go outside to confront Kellick. Once inside again,

12

> Blankenship could have remained there, but instead he chose to slip out the back, go to a nearby trailer, retrieve a shotgun, and return to continue the confrontation.

Id. at 678.

As in Blankenship, Fort did not have to go outside his home to confront Coletti. Indeed, the proffered evidence here shows that Fort acted more recklessly than did the defendant in Blankenship. Unlike the defendant in that case, Fort voluntarily initiated an interaction with Coletti, who had not physically threatened him, and did so carrying a gun at the outset. As in Blankenship, Fort did not offer facts to support the second prong of the justification defense sufficient to allow him to present the defense to the jury.

III. No Reasonable Alternative

Fort also failed to proffer evidence to show that he had no reasonable legal alternative but to possess the gun. Indeed, in his statements to police after the shooting, Fort laid out his reasonable legal alternatives and talked about how he had planned to use them:

> You know, and it's fine. Like I said, it's fine, because I have the camera on. I can always report it.
>
> And Amanda said to the uncle that – in the message – we sent a message that we're going to report it. We're going to call Police.

13

> That's where we're going to go with it. If you want me to bring it up, sue is my middle name. I don't want to kid you. I sue people on the regular. You see what I'm saying? I was just going to sue him for the money.

Ex. 4T at 1102-03. In the hearing, Fort dismissed the possibility of a lawsuit on the basis that it is not clear that a drug addict who works for a paving company would have a license or motor vehicle insurance, and so, a lawsuit is "almost nonsense talk." Hearing Tr. 134:4-135:2. As for calling the police, he argued that he did not agree that "calling the police over a scratch to a mirror is a reasonable legal alternative in this situation" in part because, he asserted, he had a right on his own property "to go outside and talk to Coletti armed with a concealed handgun . . . because of everything he knew about Coletti." Id. 135:3-14. This skepticism about Fort's potential satisfaction with the results of a lawsuit or a police report is not competent evidence that he had no reasonable legal alternative.

Indeed, the options Fort mentions are precisely the type of available alternatives that preclude a defendant from offering a justification defense. See United States v. Wofford, 122 F.3d 787, 791 (9th Cir. 1997), as amended (Aug. 21, 1997) (affirming district court's decision to preclude testimony supporting justification defense to felon-in-possession charge and noting that cases "require the defendant to seek aid from law

14

enforcement before taking matters into his own hands"); United States v. Shelton, No. 2:21-CR-00216-CCW, 2023 WL 1812743, at *5 (W.D. Pa. Feb. 8, 2023) (precluding defendant from presenting justification defense at trial and noting that "courts have held that, when a felon fears for his safety, a legal alternative to possession of a firearm is to contact law enforcement"). In other words, even if Fort was under a present threat of serious bodily injury and had not recklessly placed himself in that situation, he could have called the police before confronting Coletti with the gun.

Moreover, Fort had another reasonable legal alternative available: he simply could have stayed inside the house. Again, the evidence shows that Fort voluntarily left the house with the gun to confront Coletti. That decision alone shows that Fort failed to use a reasonable legal alternative. United States v. Bare, No. CR-12-08142-PCT-NVW, 2012 WL 5984972, at *3 (D. Ariz. Nov. 28, 2012) (precluding defendant from offering a justification defense to felon-in-possession charge because the defendant's "decision to leave his home to confront [the threat] also demonstrates that he failed to utilize a legal alternative, and so cannot establish the third element of the justification defense"), aff'd, 583 F. App'x 721 (9th Cir. 2014); United States v. Burnes, 666 F. Supp. 2d 968, 972 (D. Minn. 2009) (noting in the context of a justification defense to a felon-in-

15

possession charge that "refraining from leaving a safe location and refraining from entering a dangerous location are generally reasonable, legal alternative[s] to violating the law." (citing cases and quotation omitted)), aff'd, 423 F. App'x 671 (8th Cir. 2011).

Fort offered no evidence that his only reasonable legal alternative on the morning of November 1, 2021, was to possess a firearm. Therefore, he has failed to offer competent evidence regarding the third prong of the four-part justification test.

IV. Direct Causal Relationship

Finally, Fort did not proffer any evidence that there was a direct causal relationship between his possession of the firearm and the need to avoid the threatened harm. This factor requires little discussion in light of the court's analysis above. As mentioned, Fort presented no evidence that he was in imminent danger when he left his house while knowingly possessing the gun. Therefore, he has not shown the necessary causal relationship between his possession of the gun and the need to avoid that harm. United States v. Ashu, No. 1:10-CR-0174-WSD, 2011 WL 13176732, at *6 (N.D. Ga. May 18, 2011) ("Defendant cannot demonstrate a direct causal relationship between his criminal action and avoidance of a threatened harm already determined not to exist."), aff'd, 447 F. App'x 71 (11th Cir.

16

2011). Further, there can be no direct causal relationship when the defendant had a reasonable legal alternative to possessing the firearm, as Fort did in this case. United States v. Hatten, No. 8:09CR267, 2010 WL 1815390, at *3 (D. Neb. May 4, 2010) ("Because Hatten did not satisfy the third element, she cannot satisfy this fourth element of the test, that a direct causal relationship may be reasonably anticipated between the [criminal] action and the avoidance of the [threatened] harm." (quotation omitted)).

V.  Summary

Fort has failed to proffer evidence to support any of the four prongs of the justification defense.[6] Therefore, the court grants the government's motion to preclude him from offering evidence and argument at trial in support of that defense.

The court notes that Fort argued at the hearing that even if the court granted the government's motion, he could still present evidence and argument related to a justification defense

---

[6] Even where a defendant can show a justification defense to a felon-in-possession charge, "that justification must persist; the defendant must prove that he abandoned the illegal conduct at the earliest possible opportunity." United States v. Dutton, 351 F. App'x 269, 272 (10th Cir. 2009) (quotation omitted). Because the court concludes that Fort was not justified in possessing the gun at the time he left his house, it need not decide whether Fort proffered evidence to show that he was not required to abandon his possession at some point prior to handing the firearm to Lovejoy after the shooting.

17

if the government opened the door to the defense at trial. The court's order is based on the evidence and argument proffered in the motion practice and at the hearing. To the extent that Fort believes the evidence the government offers at trial warrants reconsideration of the court's order, he may raise that argument at the appropriate time.

## Conclusion

For the foregoing reasons, the government's motion in limine to preclude the justification defense (doc. no. 39) is granted.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

September 25, 2023

cc: Counsel of record.